UNITED STATES DISTRICT COURT
IN THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MATTHEW GILL
     Plaintiff.


 -vs-

TAMAROFF MOTORS, INC.,
GLOBAL LENDING SERVICES,
LLC
     Defendant.

Case No.
Hon.

## COMPLAINT & JURY DEMAND

### INTRODUCTION

1.    This case arises out of a common dealer scam known as "Yo-Yo Sales" or "Spot Delivery" of vehicles.

2.    A "Yo-Yo" sale occurs when a dealer sells a car to a consumer under an installment sale contract but later demands that the consumer return the vehicle because the dealer claims that financing fell through. In some extreme cases, the dealer will reclaim the vehicle through repossession, threat of arrest or tricking the consumer into returning the vehicle to the dealer.

3.    Once the dealer has retaken the vehicle, the consumer is left in a vulnerable position with no car, no money for a down payment, and no trade in vehicle. The dealer takes advantage of this compromised

position – one of the dealer's own makings – to pressure the consumer into a new agreement. That new agreement might include less favorable terms, a vehicle of lesser value, or requiring a cosigner.

4. If the dealer cannot secure the terms they demand, it simply cancels the consumer's deal without returning the client's down payment or trade in.

5. No matter what the dealer chooses to demand or provide to the consumer, the dealership treats its binding contractual obligations with the consumer as conditional, hinging upon the dealer's ability to resell the fully-executed installment contract it has with the consumer on terms that the dealer – in its own discretion – deems to be acceptable to it alone.

6. At the time of the sale, the dealer knows that it intends to retake the vehicle if the dealer cannot sell the installment contract for the dealer's desired price but withholds this information from the consumer and does not make disclosures appropriate to conditional terms of credit.

7. Consistent with this view of the conditional nature of the sale, dealers treat re-takings of these vehicles as falling within the dealers' legal

rights because they do not view the sale as complete or binding until the dealer has successfully sold the installment contract to a finance company -- even though the statutorily required disclosures provide no such information to consumers.

8. Dealers rest comfortably with these frauds because – in spite of the plain illegality of the practice – law enforcement agencies and state regulatory bodies refuse to acknowledged the illegality of the practice and regularly assist dealers in the scheme when called upon to do so by dealers.  And when consumers request assistance, those same state entities turn a blind eye to consumer complaints.

9. For purposes of these fraudulent transactions, dealers effectively represent to consumers that these deals are complete at the time of the transaction, provided the vehicle, all necessary paperwork, and all the trappings of ownership.  Specifically,

   a. the credit obligations under which the consumers agree to pay for these vehicles are unconditional in nature and fully executed;

   b. all required insurance is secured and paid for by the consumer.

c.  the dealer prepares and executes an application for title, certifying to the secretary of state under penalty of perjury that it has delivered the vehicle to the consumer and will apply for title; and

d.  any necessary down payment or trade in is provided to the consumer.

10. The State of Michigan deems vehicle transactions to be complete upon delivery of the vehicle and execution of the sale documents. Although a transfer of title to a vehicle generally indicates a transfer of ownership, under the motor vehicle code, MCL 257.1*et seq.*, one need not transfer title to transfer ownership. See *Perry v. Golling Chrysler*, 477 Mich. 62, 65 (Mich. 2007); *Botsford General Hosp v Citizens Ins. Co.*, 195 Mich. App. 127, 133-134 (1992); *Whitcraft v Wolfe*, 148 Mich App 40, 53 (1985).

11. The State of Michigan also views "Yo-Yo" sales or "Spot Deliveries" as an illegal practice, having promulgated a number of opinion letters, manuals and warnings.

12.  Notwithstanding the clear directives concerning the finality of a sale once the dealer has executed sale documents with the consumer, dealers who engage in "Yo-Yo" scams view all sales transactions as inchoate and conditional for their own purposes.

13.  Specifically, it is the purpose of the Truth in Lending Act (TILA), 15 U.S.C. § 1601 *et seq*. to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit, and to protect the consumer against inaccurate and unfair practices involving credit transactions.  Most importantly, meaningful and timely disclosures of the terms of financing provide consumers with knowledge of the "true" cost of credit prior to consummation, thereby providing market mechanisms for increased competition.  For purposes of the act, the TILA specifically requires disclosure by the creditor (car dealer) if the transaction will be subject to a demand feature, whereby the dealer my unilaterally demand payment or retake the vehicle. 12 CFR 226.18(h) and all disclosures must be meaningful, clear and conspicuous.  Illusory disclosures will not suffice.

14.   It is the function of the ECOA to provide consumers with clear and unambiguous notice of whether or not credit has been extended, and if such credit is denied or revoked, to inform the consumer of the reasons for denial.   This function furthers the statute's salutary purpose of eliminating discriminatory lending practices through a record-keeping process.   In so doing, the statute mandates a complete documentary trail establishing, when and why credit is denied.

15.   Dealers who are skilled in the practice may retrieve the customer several times, wearing down the consumer's sales resistance to these pressure tactics, until the dealer has maximized his profits from the consumer.   All the while the dealer retains the full value of any down payment or trade in.   Thus, the consumer is held captive to the seller and the terms which the dealer prescribes.

16.   As a result of this practice, the informed negotiation process mandated by TILA is supplanted in favor of a dealer-controlled, high-pressure sales ploy.   In addition to the adverse effects that this fraud works upon individual consumers, the unredressed concealment of the "actual"

terms of credit fosters anti-competitive practices in the auto industry and provides further incentives for artificially increased costs of credit.

17. In these scams, dealer may provide the consumer with numerous disclosures of the cost of credit, but only the dealer knows which terms he will ultimately accept as binding. The improper use of the TILA disclosures combined with contradictory contractual language becomes a tool for entrapping the consumer and denying him the ability to shop for credit. Effectively, this practice turns the TILA disclosures into a tool of fraud, eviscerating the meaningful disclosures required by TILA.

18. These frauds are facilitated through the knowing presentation of false disclosures under the TILA, which was enacted to thwart unfair practices in credit extension, enhance the consumer's knowledge of the financial transactions which they frequently engaged in, and improve consumer's confidence in these financial transactions.

19. By the same token, the firm requirements of the ECOA which mandate that a credit decision be made by the Dealer within 30 days of receiving

a complete application, and that the dealer provides an accurate notice of what the credit decision was.

20. This entirety of this practice is predicated upon false representations to the consumer about the nature of the transaction/s he will be entering into, the dealer's efforts to obtain financing, the conditions of the extension of credit, the consumer's rights following the execution of unconditional credit, and the right of the dealer to rescind a fully executed transaction.

21. In addition to the violations of federal law, the practice of retaining a down payment or trade in vehicle where financing has been rejected by a dealer also violates provisions of Michigan law, M.C.L. § 492.131(b) and M.C.L. § 445.141.

22. The Michigan Secretary of State promulgates an annually revised Dealer's Manual containing directives from the Secretary of State to licensed car dealer.

23. That Dealer's Manul includes express instructions from the Secretary of State to licensed dealers advising that the practice of spot delivery is illegal.

24.     Every dealer licensed in Michigan is required to affirm that it has reviewed the provisions of the Dealer's Manual each time they renew their license.

25.     As a licensed dealer, in business for several decades, Tamaroff has repeatedly affirmed that it is aware of the prohibitions against spot delivery, as found in the Secretary of State's Dealer's Manual.

JURISDICTION

26.     This court has jurisdiction under the Truth in Lending Act, 15 U.S.C. § 1640(e) and 28 U.S.C. § 1331,1337.

27.     This court has jurisdiction under the Motor Vehicle Cost Savings and Information Act, 49 U.S.C. § 32701-32711 and 28 U.S.C. § 1331,1337.

28.     This court has jurisdiction under the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq and 28 U.S.C. § 1331,1337.

29.     This court has jurisdiction under the Equal Credit Opportunity Act, 15 U.S.C. § 1691 et seq and 28 U.S.C. § 1331,1337.

30.     This court may exercise supplemental jurisdiction over the related state law claims arising out of the same nucleus of operative facts which give rise to the Federal law claims under 28 U.S.C. § 1367.

<u>**PARTIES**</u>

31.   The Plaintiff to this lawsuit is Matthew Gill who resides in Garden City, MI.

32.   The Defendants to this lawsuit are as follows:

a.   Tamaroff Motors, Inc. ("Tamaroff Honda") which is a corporation doing business in Michigan  at 28585 Telegraph Road, Southfield, MI 48034, and whose resident agent Jeffrey L. Tamaroff maintains its office at 28585 Telegraph Road , Southfield, MI  48034, and which by statute and condition of licensing, may be served through the Michigan Department of State, Compliance Division, 3rd Floor -- Treasury Building, 430 W. Allegan Street, Lansing, MI 48918.

b.   Global Lending Services, LLC. (GLS) which is a corporation doing business through its authorized dealer (Tamaroff) in the State of Michigan. GLS is registered in the state of Michigan and maintains its resident agent's offices at 186 N Main Street, 2ND Floor, Ste 1, Plymouth, MI  48170. GLS maintains its business at 1200 Brookfield Blvd., Ste. 300, Greenville, SC 29607.

<u>VENUE</u>

33.    The transactions and occurrences which give rise to this action occurred in Oakland and Wayne counties.

34.    Mr. Gill is a citizen of the State of Michigan and resides in Wayne County.

35.    Venue is proper in the Eastern District of Michigan.

<u>GENERAL ALLEGATIONS</u>

36.    On or about April 2, 2025, Mr. Gill went to Tamaroff Honda for the purpose of purchasing a vehicle.

37.    Mr. Gill identified a 2023 Honda Civic that he wished to purchase.

38.    The salesperson for Tamaroff requested information from  Ms. Gill to complete a credit application.

39.    Mr. Gill provided truthful information concerning his credit, income, and employment according to the instructions given by the Tamaroff representative.

40.    Mr. Gill provided the salesperson a description of his employment as a travelling Registered Nurse who contracts were for fixed periods and renewed at the end of each contract.  Additionally, Mr. Gill described

to the salesman his pay which included both W-2 regular income and reimbursements for travel and expenses.

41. Mr. Gill provided several pay stubs substantiating his income and employment.

42. Mr. Gill provided Tamaroff with other documentary proof of his income, including bank statement showing payroll deposits to his bank account.

43. Tamaroff's salesperson received the paystubs and credit information from Mr. Gill.

44. Tamaroff's salesperson processed the information into the electronic credit application on the Tamaroff computer.

45. On April 2, 2025 Tamaroff accessed and used a copy of Mr. Gill's Trans Union consumer report, which was purchased through 700 Credit.

46. Tamaroff's staff assembled a proposed deal for the Honda Civic to be purchased by Mr. Gill over time under a retail installment sales contract.

47. Tamaroff then sought preapproval from several financial institutions to purchase the anticipated installment sales contract from Tamaroff.

48. Tamaroff processed the terms of the proposed installment contract with Mr. Gill into its dealer financing portal, Dealertrack.

49. Tamaroff then processed Mr. Gill's credit information and income information into Dealertrack and forwarded the deal and credit information to proposed finance companies through which Tamaroff sought jointly to qualify Mr. Gill for credit.

50. Specifically, Tamaroff forwarded Mr. Gill's proposed deal and credit application to Ally Financial, AmeriCredit, Santander, GLS, and Consumer Portfolio Services.

51. Tamaroff has established agreements with each of the finance companies to which it had submitted the proposed deal with Mr. Gill.

52. Those agreements – referred to in the industry as "authorized dealer" agreements – establish the terms and conditions under which Tamaroff may sell retail installment sale contracts to the finance companies.

53. Within the retail automotive finance industry, the sale of a retail installment sale contract is referred to as selling "a deal," and the payment for those contracts is referred to as "funding" of "the deal."

54. Under these authorized dealer agreements, Tamaroff is permitted to submit deals for purchase, and upon approval from the finance company may execute necessary documents on behalf of the finance company to effectuate that transaction.

55. Among the documents which dealers like Tamaroff may execute on behalf of the finance company are documents transferring liens into the name of the finance company.

56. One April 2, 2025, GLS notified Tamaroff that it would purchase the anticipated installment contract with Mr. Gill but not on the terms proposed by Tamaroff. Rather, GLS made a "counter offer" which it expected to be communicated by Tamaroff to Mr. Gill.

57. Tamaroff withheld GLS's denial and GLS counteroffer from Mr. Gill and instead notified Mr. Gill that he had been approved for credit to purchase the Honda Civic.

58. Even though it had not received any approval for its proposed deal from any finance company, Tamaroff prepared the necessary and usual documents of sale for Mr. Gill's purchase of the Honda Civic under the terms it had proposed to the finance companies over the Dealertrack

portal, naming GLS as the finance company and lien holder for the financing.

59.   Tamaroff requested that Mr. Gill provide a $4,000 downpayment.

60.   Mr. Gill gave $4,000 as a down payment which was received by Tamaroff.

61.   Mr. Gill agreed to the terms proposed by Tamaroff and executed sale documents, including a

    a.   Retail installment sales contract

    b.   A purchase agreement

    c.   Odometer statement

    d.   Reassignment of title

    e.   Service contract.

    f.   Used Car Warranty

    g.   Acceptance

    h.   Confirmation of Insurance

    i.   We Owe Confirmation

    j.   Registration Eligibility Declaration

    k.   Application for Title

      l.     E-Sign Consent

      m.    Buyer's Final Signature Document

62. Where applicable, each of the relevant documents identified and informed Mr. Gill that GLS was the finance company and lien holder.

63. None of the documents provided Mr. Gill with the necessary information to make payments to GLS, and Mr. Gill expected that he would receive an invoice or a payment coupon book from GLS.

64. Tamaroff Executed the documents selling the vehicle to Mr. Gill and retaining a UCC Article 9 lien on the vehicle.

65. Tamaroff executed and filed an application of title with the Michigan Secretary of State.

66. That application for title put legal title in Mr. Gill's name and assigned the lien on the Honda Civic to GLS.

67. Immediately following the execution of the sale documents, Tamaroff assigned the installment sales contract to GLS.

68. Tamaroff delivered the keys and the vehicle to Mr. Gill.

69. Tamaroff provided Mr. Gill with a thumb drive which was supposed to contain his documents from the sale but was corrupt and unreadable.

70.   Tamaroff effectively provided no copies of the documents that it had Mr. Gill sign.

71.   Mr. Gill accepted the vehicle and drove it home.

72.   Shortly after the sale, Tamaroff collected and transmitted the sale documents to GLS.

73.   Upon receipt of the documents, GLS began its due diligence to verify the information in the sale documents, including the   credit application.

74.   After receiving receipt of the transactional documents for the purchase of the Honda Civic, GLS notified Tamaroff that the deal did not conform to the terms that it had communicated to Tamaroff on April 2, 2025.

75.   Global Lending Services refused to purchase or "fund" the purchase of the retail installment contract from Mr. Gill's purchase of the Honda Civic and returned the deal to Tamaroff.

76.   In returning the deal back to Tamaroff, Global lending cited an approximate $2,613 discrepancy in Mr. Gill's pay  as the basis for rejecting the deal.

***NOTE FROM DEALERCOMM***

PENDING RETURN: Deal will be RETURNED in 24 hours if missing documents not received. MISSING ITEMS: Contract Held (Customer indicated they have questions regarding Gap and/or Warranty), Verification of Employment. Income short of submitted approval by $2612.32, please advise of any additional income.

Please note that the package we received was contracted outside of our approval ( Front end amount exceeded , Cash Down ) and is under management review. Contact your buyer.

77. Mr. Gill received no instructions on where or how to make tender payments to GLS.

78. Following the rejection by GLS, on June 9, 2025, Tamaroff left a voice message for Mr. Gill and informed him that his transaction had fallen through and that he needed to immediately call Tamaroff or else Tamaroff would take the Honda Civic from Mr. Gill.

79. That call on June 9, 2025 was the first notice to Mr. Gill that anything was amiss with purchase of the Honda Civic.

80. After researching the issue on the internet, Mr. Gill learned that he was likely in the midst of a "spot delivery."

81.   Mr. Gill responded to the voice message with an email indicating that he would not be returning the vehicle and requesting that any further communications be in writing.

82.   Tamaroff then contacted the Southfield Police to report Mr. Gill's vehicle as stolen, even though the vehicle was sold legitimately to Mr. Gill, and the transaction was complete and legally binding.

83.   The Southfield Police received the complaint and described the complaint against Mr. Gill as "Motor Vehicle Fraud - Obtaining Money/Goods, False Pretenses [24003]" but described the vehicle as having been "locally stolen."

84.   The Southfield Police then entered the vehicle as stolen in the LIEN system, placing Mr. Gill at jeopardy of being arrested in a "high risk" felony stop by police.

85.   The Southfield police enlisted the services of the Oakland County Sheriff's Commercial Auto Theft unit to assist in the investigation.

86.   At the behest of Tamaroff the Garden City Police, Oakland County Sheriff and Quality Towing went to the home of Mr. Gill with two unmarked pickup trucks, a tow truck and two marked patrol units.

87.  Members of the law enforcement team, which was clad in tactical gear including bullet-proof vests and weapons, went to Mr. Gill's door and initiated an interrogation which presumed that he had wrongfully stolen the vehicle that he had, in fact, legally purchased.

88.  The officer in charge demanded the keys for the vehicle, asking "Do you want to give me the keys?"

89.  Mr. Gill turned over the keys under duress.

90.  Mr. Gill complied with the officer in charge's request.

91.  The officer in charge then coordinated the taking of the vehicle from Mr. Gill.

92.  The law enforcement team then impounded the Honda Civic and allowed Tamaroff to retrieve the vehicle.

93.  The law enforcement team provided no receipt or instructions to Mr. Gill on how to retrieve the vehicle, nor did they provide any notice of how he might challenge the taking and secure its return.

94.  Tamaroff then retrieved the vehicle from the police impound, even though Tamaroff was not the owner of record or lien holder of record at the time of the taking.

95.   At the time of the taking, the lien holder of record was GLS.

96.   The fact that Mr. Gill was the owner of record and that GLS was the lien holder was known to the law enforcement officers at the time that they stole the vehicle from Mr. Gill.



97.   Following the theft of Mr. Gill's vehicle, Tamaroff retained all but $1,422.71 of Mr. Gill's $4,000 down payment.

## Count I -- CIVIL RIGHTS VIOLATION, 42 U.S.C. § 1983 (TAMAROFF HONDA)

98.   Tamaroff acted in concert with the Garden City, Southfield, and Oakland county law enforcement officers to forcibly effect the theft of Mr. Gill's Honda Civic.

99.   At the time that Tamaroff and law enforcement officials took the vehicle,

   a.   Tamaroff was not the titled owner of the vehicle.

   b.   Tamaroff was not the lien holder of record; and

    c.     Mr. Gill was the legal owner of the vehicle.

100.   Tamaroff had no lawful means to take possession of the vehicle from Mr. Gill.

101.   In resorting to the assistance of multiple law enforcement offices and coordinating efforts to take the vehicle, Tamaroff acted in concert with law enforcement under color of law.

102.   As a result of its unlawful, malicious, reckless and indifferent acts to take Mr. Gill's Honda Civic, Tamaroff deprived Mr. Gill of his rights, privileges, or immunities secured under the Constitution and laws of the United States and 42 U.S.C. § 1983 including:

    a.     Plaintiff's right to be free from an unreasonable search or seizure of his person, as guaranteed by Amendments IV and XIV of the United States Constitution, by invading his privacy at home. without probable cause, a search warrant, an arrest warrant, or even articulable suspicion to believe that he committed a crime.

    b.     Plaintiff's right to be free from an unreasonable search or seizure of his person, as guaranteed by Amendments IV and XIV of the United States Constitution, by confiscating his automobile and

refusing to return it, notwithstanding that fact that it was done without benefit of a warrant, or lawful probable cause to detain it.

c.    Plaintiff's right to due process of law and to be free from egregious official misconduct, as guaranteed by Amendment XIV of the United States Constitution, by forcing him to submit to repeated and lengthy coercive and police interrogations.

d.    Plaintiff's right to due process of law, as guaranteed by Amendment XIV, by summarily repossessing his automobile without due process or compensation.

103.  As a result of the conduct of Tamaroff, Mr. Gill suffered the loss of his vehicle, emotional distress and the denial of his constitutional rights.

## **Count II -- TRUTH IN LENDING ACT (TAMAROFF HONDA)**

104.  At all relevant times Tamaroff Honda -- in the ordinary course of its business -- regularly extended or offered consumer credit for which a finance charge is, or may be imposed or which, by written agreement is payable in more than 4 installments and is the person to whom the transaction which is the subject of this action is initially payable, and is a "creditor" under TILA, 15 U.S.C. § 1602(f) and regulation Z § 226.2(a)(17).

105. Tamaroff Honda holds a license as a retail instalment seller of motor vehicles under to M.C.L. § 492.101 *et seq*.

106. Tamaroff Honda identifies itself as the "creditor" every credit transaction which engages where it executes a retail installment sales contract with a customer.

107. The TILA disclosures provided by Tamaroff Honda failed to disclose that Tamaroff Honda would retake the vehicle if Tamaroff Honda could not find a willing assignee.

108. This undisclosed term operated as a "Demand Feature" for purposes of the TILA.

109. The TILA requires Tamaroff Honda to disclose any demand feature along with the other segregated disclosures.

110. Tamaroff Honda violated the TILA by failing to disclose this Demand Feature.

111. Tamaroff Honda's failure to disclose that Tamaroff Honda would retake the vehicle if Tamaroff Honda could not find a willing assignee rendered the TILA disclosures provided by Tamaroff Honda to be illusory and not "meaningful" for purposes of the TILA.

112.  Tamaroff Honda failed to disclose terms concerning the conditional nature of the credit which it deemed to be operative and therefore rendered the operative disclosures unmeaningful and misleading.

113.  Tamaroff Honda was required to make the disclosures pursuant to 15 U.S.C. § 1638 prior consummation the financing of the vehicle.

114.  Those disclosures were required to be made in writing, in a form that could be kept by the consumer so that consumers may shop for credit prior to engaging in a credit transaction.

115.  Tamaroff Honda failed to make those disclosures in a timely fashion in violation of 15 U.S.C. § 1638(a)(4).

116.  Mr. Gill suffered the denial of the statutorily mandated information under the TILA.

## Count III -- Equal Credit Opportunity Act (Tamaroff Honda)

117.  Tamaroff Honda holds a license as a retail instalment seller of motor vehicles under to M.C.L. § 492.101 *et seq.*

118.  Tamaroff Honda identifies itself as the "creditor" every credit transaction which engages where it executes a retail installment sales contract with a customer.

119.  Tamaroff Honda participates in credit decisions in relation to its credit customers.

120.  Tamaroff Honda regularly participates in the profit generated by credit contracts in the form of "dealer participation" or "reserve" amounts.

121.  No third party has the authority to direct Tamaroff Honda to execute any particular retail installment sales contract, including the one envisioned between Tamaroff Honda and Mr. Gill.

122.  Following the receipt of the complete application for credit by Mr. Gill, Tamaroff Honda was required to make a credit decision within 30 days.

123.  Based upon that credit application Tamaroff Honda notified Mr. Gill that he had been approved for credit and later revoked that credit without default by Mr. Gill and failed to send notice that it had revoked credit.

124.  Alternatively, Tamaroff's approval was false in that Tamaroff had not completed its credit decision, and Tamaroff denied credit without providing an adverse action notice.

125. Tamaroff's actions in relation to Mr. Gill constituted adverse action for purposes of the ECOA.

126. Tamaroff Honda failed to issue an appropriate adverse action notice to Mr. Gill, which the ECOA requires of users of consumer reports who take adverse action.

127. This failure to issue an adverse action notice constituted a negligent violation of the ECOA, 15 U.S.C. § 1682 by Tamaroff Honda.

128. As a result of this violation of the ECOA by Tamaroff, Mr. Gill was denied the information required by the ECOA.

## Count IV -- EQUAL CREDIT OPPORTUNITY ACT (GLS)

129. GLS is a nationwide auto finance company.

130. In the regular and ordinary course of business, GLS regularly considers and decides credit applications from consumers jointly with dealers like Tamaroff when consumers seek to purchase vehicles on credit.

131. GLS received a credit application from Mr. Gill submitted through Tamaroff.

132. GLS accessed and used Mr. Gills consumer report for the purposed of considering his application.

133.   GLS participated in the credit decision in relation to Mr. Gill's application for credit to Tamaroff.

134.   GLS was not on site or in direct communication with Mr. Gill at the time of his application to purchase the Honda Civic on credit.

135.   GLS designated Tamaroff as GLS's agent for purposes of communicating credit approvals and counteroffers.

136.   Rather than informing Mr. Gill that he had been denied by GLS and of the available counteroffer of credit that was made available through GLS, Tamaroff informed Mr. Gill that GLS had unconditionally approved his application for credit.

137.   The approval notice conveyed by GLS through Tamaroff was false and in violation of the ECOA.

138.   The failure to convey the available counteroffer constituted a violation of the ECOA.

139.   GLS failed to send any adverse action notice reflecting its refusal to extend credit to Mr. Gill in violation of the ECOA.

140. GLS regularly, and in the ordinary course of business, conveys approvals and counteroffers of credit through its authorized car dealers like Tamaroff.

141. GLS is responsible for the failure of its agent, Tamaroff to accurately and truthfully convey notices which it has authorized Tamaroff to convey.

142. GLS has violated the ECOA by failing to send appropriate notices reflecting their credit decision in relation to Mr. Gill.

143. As a result of this violation of the ECOA by GLS, Mr. Gill was denied the information required by the ECOA.

## Count V -- BREACH OF CONTRACT AND WARRANTY OF TITLE (TAMAROFF HONDA)

144. The vehicle constitutes a "good" under article 2 of the UCC, M.C.L. § 440.2101 et seq.

145. Tamaroff's demand that Mr. Gill return the Honda Civic before Mr. Gill's first payment was due and without breach by Mr. Gill constituted a repudiation of the contract.

146.    Tamaroff's demand that Mr. Gill return the Honda Civic before Mr.
Gill's first payment was due and without breach by Mr. Gill constituted
a breach of Tamaroff's warranty of title.

147.    Tamaroff's theft of Mr. Gill's vehicle constituted a breach of contract as
its demands were contrary to Michigan Law concerning spot delivery
and therefore in violation of the duty of good faith and fair dealing
under Article t2 of the Michigan Uniform Commercial Code, M.C.L. §
440.1304.

148.    Mr. Gill has suffered the loss of his vehicle and money as a result of the
breach of contract and warranties by Tamaroff.

**Count VI -- Revised Judicature Act (Tamaroff Honda)**

149.    After obtaining Mr. Gill signature on all documents necessary to
convey title and complete the financing of the vehicle, Tamaroff Honda
delivered the vehicle Mr. Gill.

150.    Mr. Gill was the owner of the Honda Civic and entitled to the quiet
enjoyment and possession of that vehicle.

151.    Tamaroff Honda took the vehicle from Mr. Gill without legal right.

152. Tamaroff Honda  was not acting on behalf of any individual or entity with the right to possess the vehicle.

153. Tamaroff Honda illegally retook possession without the permission of Mr. Gill or other legal authorization.

154. Tamaroff Honda's actions in taking possession of the vehicle were willful or intentional, and in derogation of the contract of sale.

155. Tamaroff secreted and kept the vehicle away from Mr. Gill.

156. These acts constitute a willful or intentional conversion under the Revised Judicature Act (RJA), M.C.L. § 600.2919a.

157. Mr. Gill suffered damages as a result of this violation of the RJA.

### Count VII -- UCC ARTICLE 9 (TAMAROFF HONDA)

158. This claim is brought under Article 9 of the revised Uniform Commercial Code, M.C.L. § 440.9101 *et seq*.

159. In the course of effecting the repossession of the vehicle, Tamaroff Honda's designated repossession agents – Southfield, Garden City, and Oakland County law enforcement -- breached the peace by taking his Honda Civic without right and over his lawful objection, effectively stealing the vehicle.

160. This breach of the peace constituted a violation of Article 9 of the UCC, M.C.L. § 440.9609.

161. Tamaroff Honda effected this repossession wrongfully, and without legal right.

162. As a result of this wrongful repossession, Tamaroff Honda violated Article 9 of the Michigan UCC, M.C.L. § 440.9609.

163. Tamaroff failed to send a proper notice of intent to dispose of the property to Mr. Gill.

164. Tamaroff failed to dispose of the vehicle in a commercially reasonable fashion, and in accordance with the requirements of Article 9.

165. The failure to send this notice constituted a violation of Article 9 of the UCC, M.C.L. § 440.9611.

166. The false statement of the reasons for default constituted a violation of Article 9 of the UCC, M.C.L. § 440.9619.

167. Prior to taking the vehicle from Mr. Gill, Tamaroff repudiated its contract  rendering it in breach  and legally disallowed from repossessing the vehicle.

168. At the time of the repossession, GLS was the lien holder of record, and Tamaroff had no legal right to repossess.

169. Tamaroff affected this repossession wrongfully, and without legal right.

170. As a result of this wrongful repression, Tamaroff was proceeding in violation of Article 9 of the UCC, M.C.L. § 440.9609.

171. Tamaroff failed to comply with the requirements of Article 9 of the UCC in relation to the disposition of the vehicle and notices to be sent to Mr. Gill.

172. Tamaroff imposed charges in relation to the repossession that exceeded those permitted by Article 9.

173. Mr. Gill suffered the loss of his vehicle and wrongful charges as a result of this violation of Article 9 of the UCC.

### Count VIII -- MICHIGAN REGULATION OF COLLECTION PRACTICES ACT (TAMAROFF HONDA)

174. Tamaroff Honda is a "regulated person" for purposes of the Michigan Regulation of Collection Practices Act ("MRCPA"), M.C.L. § 445.251(g).

175. Mr. Gill is a "consumer" for purposes of the MRCPA, M.C.L. § 445.251(d).

176. Tamaroff made untrue statements concerning the rights of itself and Mr. Gill in an attempt to recover the Honda Civic.

177. Tamaroff made false and misleading statements concerning Mr. Gill's application for credit to both Mr. Gill and law enforcement of Southfield, Garden City and Oakland County in an effort to recover the Hona Civic.

178. Tamaroff employed the use of law enforcement officers in order to recover the Honda Civic.

179. Tamaroff Honda has violated one or more of the MRCPA.

180. Tamaroff's violations of the MRCPA were willful, and in reckless disregard of Mr. Gills' rights.

181. Mr. Gill suffered the loss of his vehicle and emotional distress as a result of these violations of the MRCPA.

### Count IX -- Motor Vehicle Sales Finance Act (Tamaroff)

182. This claim is brought under the Michigan Motor Vehicle Sales Finance Act ("MVSFA"), M.C.L. § 492.101 et seq.

183. Tamaroff failed to properly include in the retail installment contract each and every one of the material terms of the installment sale, and omitted the single most relevant term, namely whether the deal was final or conditional, in violation of M.C.L. § 492 112(a).

184. Tamaroff has illegally retained a portion of Mr. Gill's down payment to impose illegal charges in violation of the MVSFA.

185. Tamaroff improperly required Mr. Gill to purchase GAP insurance and failed to make the proper disclosures and secure voluntary consent.

186. Mr. Gill suffered the imposition of illegal fees and the loss of his vehicle as a result of this violation of the MVSFA.

## Count X -- MICHIGAN CREDIT REFORM ACT (TAMAROFF)

187. This claim is brought under the Michigan Credit Reform Act ("MCRA"), M.C.L. § 445.1851 *et seq*.

188. Tamaroff is a regulated lender within the meaning of the MCRA, M.C.L. § 445.1851 *et seq*.

189. Tamaroff retained a portion of Mr. Gill's down payment contrary to law as a fee.

190. Tamaroff imposed fees upon Mr. Gill which are in excess of those authorized by the MCRA, M.C.L. § 445.1851 *et seq.*

191. Mr. Gill suffered damages as a result of these violations of the MCRA.

### JURY DEMAND

192. Mr. Gill demands a jury trial in this case.

### REQUEST FOR RELIEF

193. Mr. Gill requests  that the Court grant the following relief:

    a.    Assume jurisdiction over this case including all supplemental claims.

    b.    Actual damages for items including emotional distress, mental anguish, frustration, humiliation, and embarrassment.

    c.    Award statutory and punitive damages.

    d.    Award statutory costs and attorney fees along with prejudgment interest.

Respectfully Submitted,

By:  /s/ Ian B. Lyngklip
Ian B. Lyngklip P47173
**LYNGKLIP & ASSOCIATES,**
**CONSUMER LAW CENTER, PLC**
Attorney for Matthew Gill
13751 W. 11 Mile Road
Oak Park, MI  48237
Ian@ConsumerLawyers.com
(248) 208-8864

Dated: October 28, 2025